IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　Plaintiff<br><br>v.<br><br>BETH ZASTAWNY,<br>　　　Defendant | )<br>)<br>)<br>)　CRIMINAL NO.: 3:19-CR-30019-MGM<br>)<br>)<br>)<br>) |

## BETH ZASTAWNY'S SENTENCING MEMORANDUM

Beth Zastawny ("Ms. Zastawny"), through counsel, files this sentencing memorandum in support of a sentence below the advisory guideline range. Ms. Zastawny respectfully requests that this Honorable Court exercise its discretion to impose a sentence "sufficient, but not greater than necessary" to achieve the sentencing purposes of 18 U.S.C. §3553(a).

### I. SUMMARY ARGUMENT

The probation department completed a Presentence Investigation Report ("PSR") on the defendant, dated September 3, 2019, which recommends an advisory guideline range ("AGR") of imprisonment for 57 to 71 months. The defendant objects to this guideline range for the reasons set forth below.

The first basis for imposition of a sentence below the AGR is Ms. Zastawny's timely and extensive cooperation with authorities which the defendant believes merits a U.S.S.G. s. 5K1.1 motion from the government. The second set of bases for imposition of such a sentence are Ms. Zastawny's age and ill health under U.S.S.G. s. 5H. The final basis is the presumption of a sentence "other than imprisonment" for first offenders who have not been convicted of a crime of violence or an otherwise serious offense. 28 U.S.C. s. 944(j). The Court should consider all of these factors and conclude that a downward departure pursuant to Section 5K1.1 and/or Section

3353(c) is warranted and a sentence within the AGR would be greater than necessary to fulfill the interest of justice. A sufficient sentence would be supervised release or home confinement with allowance for Ms. Zastawny to attend appointments for medical care.

## II. BACKGROUND

Ms. Zastawny was born on July 29, 1965, in Worcester, Massachusetts and raised in Grafton, Massachusetts, alongside her two brothers, Todd and Thomas. At a young age, Ms. Zastawny thrived in the Grafton public school system in both academics and athletics. Unfortunately for Ms. Zastawny her adolescence was plagued by tragedy.

At the young age of thirteen, Ms. Zastawny returned home from school one day to the smell of gun smoke and found her father with a self-inflicted gunshot wound to the head. Ms. Zastawny was alone when she found her father, and has essentially been alone in coping with this trauma ever since. Not only did Ms. Zastawny have to deal with the aftermath of her father's suicide, but she also had to adjust to her mother remarrying just six months after his death. Eventually, as a result of the trauma, Ms. Zastawny's family fell apart and she was left to live with a friend's family for the remainder of her high school years.

Despite facing the tragic death of her father, and moving out of her home at a young age, Ms. Zastawny worked hard throughout her high school years to earn a softball scholarship to Nichols College in Dudley, Massachusetts. In her junior year at Nichols, Ms. Zastawny was informed that the College cut all softball scholarships, including hers. Ms. Zastawny did not falter, instead, she worked three jobs to support herself through her final two years of college. In 1987 she graduated with a Bachelor's degree in Accounting, and was immediately hired as an accountant at one of the largest CPA firms nationally, Coopers & Lybrand (now known as Price Waterhouse) where she became a partner.

In 2001 Ms. Zastawny left Price Waterhouse ("PWH") and began working as CFO for HBA Cast Products Co. ("HBA") in Springfield, Massachusetts (a former PWH client Ms. Zastawny serviced while at PWH). In 2001, Ms. Zastawny left PWH and became the CFO for HBA and subsequently in 2004 Ms. Zastawny took the risk to make a career change and engaged in a management buyout – purchasing the company's two Virginia locations and forming DieCast Connections Inc. ("DieCast") the successor to HBA. Shortly thereafter, DieCast was awarded a contract with Stanley Black and Decker and Ms. Zastawny consolidated the two Virginia plants and opened a second location in Chicopee, Massachusetts.

As the 2008 recession hit, Ms. Zastawny struggled to try and keep DieCast afloat. First, Ms. Zastawny exhausted her personal assets, including using her own personal savings, borrowing from her 401k, maximizing her credit cards, credit lines, taking out a line of credit against her personal home, and even reducing her annual salary from $125,000 to $20,000 in order to keep Diecast in business. She worked tirelessly to ensure that DieCast met its financial obligations and that her employees were able to keep their jobs.

Although she did everything in her power to keep DieCast afloat, soon Ms. Zastawny's personal assets were depleted. For the first time in her life, Ms. Zastawny was forced to turn to her family and friends for support, and many of them loaned her money, including her mother and her brother Thomas.

In an effort to repair her family relationships, and repay the loans she accepted from family and friends, Ms. Zastawny began to work with Anthony Riccitelli ("Riccitelli") a loan officer she originally met in 2001 while he was employed by Fleet Bank as a work out officer and assigned to the HBA loan account.

Riccitelli, through his various business entities, provided Ms. Zastawny with several loans as outlined in more detail in Exhibit A. With Riccitiello's enticement and manipulation, Ms. Zastawny refinanced DieCast's debt with Blue Hills Bank ("Blue Hills"), but eventually Blue Hills foreclosed on DieCast with losses in excess of $3 million dollars.

From the time Ms. Zastawny borrowed funds from family, friends and Blue Hills she received nominal compensation from the business and often went without pay. She lived in a modest home she shared with a roommate and had no other significant assets as she had liquidated all of her life savings and assets to support DieCast.

As the business floundered, Ms. Zastawny began to receive immense pressure from her brother, Thomas, regarding the loans he made to DieCast. On several occasions Thomas would contact Ms. Zastawny and berate her about repayment of the loans, apologizing at later dates for his verbal abuse. Just before the Christmas holiday, Thomas even threatened to cut Ms. Zastawny off from the family, including her nephew who she adored. Shortly after Christmas, Thomas became extremely depressed as his father had. Despite his ill treatment of his sister, Ms. Zastawny did everything in her power to assist her brother. She tirelessly traveled to his home, the hospital, and took him to various medical appointments in an effort to help him overcome his depression. On January 24, 2017, Ms. Zastawny's worst nightmare came true when she arrived at Thomas' home to bring him to a medical appointment. In similar fashion to her father, she discovered Thomas' lifeless body with a self-inflicted gunshot wound to the head. Immediately, the trauma from her childhood revisited her and she experienced the same feeling she had when she discovered her father after he had committed suicide during her childhood.
Thereafter, Ms. Zastawny's guilt intensified immensely as she felt responsible for her brother's action because she had not been able to repay his loan.

Throughout this entire process Ms. Zastawny has been under an immense amount of stress without any mental health treatment. For years she struggled with health problems without answers until finally in 2017 she was diagnosed with multiple sclerosis ("MS"). Since the diagnosis, Ms. Zastawny undergoes a rigorous treatment regimen for her MS, and also sees a counselor for Major Depressive Disorder. See Letter filed under seal from Monique Sherman, LCSW, which will be supplemented as Exhibit B. Despite her battle with MS and depression, Ms. Zastawny continued to work so that she could secure health insurance to cover her extensive medical costs and continue to repay friend and family member loans.

### III. ACCEPTANCE

From the outset, Ms. Zastawny accepted responsibility for her involvement in this case, and has demonstrated remorse for her conduct. Ms. Zastawny's conduct was an isolated incident, and she has had no further involvement with Riccitelli or related individuals. Ms. Zastawny timely notified authorities of her intention to enter a plea of guilty, and permitted the government to avoid preparation for trial and the U. S. Attorney's Office to allocate its resources efficiently. As a result of Ms. Zastawny admitting to her involvement in this matter, she was granted "acceptance of responsibility" pursuant to U.S.S.G. s. 3E1.1(a) and (b). See PSR p.5 & 7.

### IV. LAW AND ARGUMENT

#### A. A Downward Departure in Sentencing is Discretionary Pursuant to United States v. Booker

Ms. Zastawny respectfully requests the Court impose a sentence of supervised release, or home confinement with allowance for Ms. Zastawny to attend appointments for medical care for a period of time the Court deems appropriate. Pursuant to the Sentencing Guidelines a period of supervised release may be ordered for the offenses charged in the indictment. In seeking a sentence below the applicable advisory guideline range, Ms. Zastawny requests the court take

note that the United States Sentencing Guidelines, as promulgated by the United States Sentencing Commission, no longer bind federal courts. *United States v. Booker,* 543 U.S. 220, 259 (2005). While the district court is not bound by the guidelines, it still must consult and consider them when imposing a sentence. *Id.* 543 U.S. at 264. The First Circuit has noted that "there is no stringent mathematical formula that cabins the exercise of the sentencing court's discretion." *United States v. Marin,* 520 F.3d 87 (1st Cir. 2008). The sentencing inquiry, once the court has duly calculated the GDR, is broad, open-ended, and significantly discretionary. At that point, the sentencing process becomes a judgment call. *Id.* at 91-92 (internal citations and quotations omitted) (affirming a 91-month downward deviation from the advisory sentencing guideline range).

### B. The Sentencing Guidelines Allow for a Downward Departure in Sentencing Based on Substantial Assistance to Authorities

Ms. Zastawny's substantial assistance to authorities warrants a downward departure in sentencing. The Commentary and Notes to 18 U.S.C. s. 3553(c) provide in pertinent part:

> A defendant's assistance to authorities in the investigation of criminal activities has been recognized in practice and by statute as a mitigating sentencing factor. The nature, extent, and significance of assistance can involve a broad spectrum of conduct that must be evaluated by the court on an individual basis. Latitude is, therefore, afforded the sentencing judge to reduce a sentence based upon variable relevant factors…

18 U.S.C. s. 3553(c). Commentary – Application Notes 3.

A court may depart downward where the defendant's cooperation with the government in either the investigation at bar or in other matters rises to the level of substantial assistance. U.S.S.G. s. 5K1.1. Immediately following her indictment, Ms. Zastawny timely and extensively cooperated with the government. She provided the government with information regarding Riccitelli's involvement and orchestration of the matters which are the subject of this case,

6

ultimately leading to his indictment and plea of guilty in the United States District Court on charges of Participation in Loan with Financial Institution pursuant to 18 U.S.C. s. 1005. See Letter and Supplemental Email to the Government dated October 25, 2019 and October 26, 2019 2019, and filed under seal attached hereto as Exhibit A.

Without Ms. Zastawny's cooperation with the government, the United States Attorney's Office would not have had the pertinent information and background to charge Riccitelli with defrauding Blue Hills by obtaining $80,000.00 from Ms. Zastawny's company, Diecast, in return for a $70,000 loan from the entity he owned and controlled SeMass. The courts grant variances in sentencing based on less cooperation and assistance than what Ms. Zastawny has provided here, including granting downward departures for defendants whose cooperation breaks down or for defendants who flee and lose the government's willingness to file a s.5K1.1 motion. *United States v. Tenzer,* 213 F.3d 34 (2d Cir. 2000); *United States v. Castellanos,* 2008 WL 5423858 (D. Neb. Dec. 29, 2008). Ms. Zastawny acted timely and in good faith in her extensive cooperation efforts and should receive a substantial downward departure below the advisory guideline range.

### C. The Sentencing Guidelines Allow for a Downward Departure in Sentencing Based on Physical Condition and Age Pursuant to U.S.S.G s. 5H1.4

The United States District Court for the District of Massachusetts has held that although ill health and age do not ordinarily warrant departure from the sentencing guidelines, the guidelines recognize there may be "extraordinary physical characteristics" which do justify a downward departure in sentencing. *United States v. Willis,* 322 F.Supp.2d 76, 84 (2004). "'[A]ge may be a reason to impose a sentence below the applicable guideline range when the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration.'" U.S.S.G. s. 5H1.1; *United States v. Baron,* 914

F.Supp. 660, 662 (1995). For purposes of a downward departure in sentencing, "age and infirmity are linked by a conjunction in s. 5H1.1." *Id.*

The United States District Court for the District of Massachusetts applies a three-part test to determine whether a downward departure in sentencing is appropriate based on ill health: (a) there is a serious and imminent medical threat; (b) which would be made worse by incarceration; and/or (c) which the Federal Bureau of Prisons ("BOP") could not adequately treat." *United States v. Willis,* 332 F.Supp.2d 76, 84 (2004) quoting *United States v. Baron,* 914 F.Supp. 660, 662-663 (D.Mass. 1995). Typically, the Sentencing Guidelines discourage a downward departure in sentencing based on ill health, however, the guidelines do allow a downward departure based on a Defendant's physical condition and age if there exists "extraordinary physical impairment." At that time, the Court should "balance infirmity and cost." U.S.S.G. s. 5H1.4; *United States v. Willis,* 332 F.Supp.2d 76, 82 (2004).

In *Baron,* the United States District Court for the District of Massachusetts ordered a downward departure in sentencing for the Defendant who was 76 years old and suffered from extraordinary medical conditions. The Defendant had several pituitary tumors removed, which left him without pituitary function. He received a strict course of steroid replacement drugs, which required constant monitoring by physicians. Additionally, without pituitary function, "relatively innocuous medical problems (such as a viral illness)" could have been life-threatening to the Defendant. *Id.* at 663. The Defendant also suffered from a cardiac condition, which placed him at risk for a "serious cardiovascular event." *Id.* at 664. The court assessed whether a downward departure in sentencing was appropriate using the aforementioned three-part test in Baron. *Id.* at 662-663. The Court held the Defendant's medical conditions were unstable, interrelated, and potentially exacerbated each other. The Defendant's medical conditions were

likely to be upset by the stress and exposure of even "common germs," and if his conditions were upset, he would suffer a "rapid deterioration to a life-threatening illness." *Id.* at 663. Additionally, the Court held that stress as a result of imprisonment could upset the Defendant's medical conditions, and that although the Federal BOP was a "good facility" the potential for the Defendant's medical condition to deteriorate if incarcerated was enough to warrant home confinement. *Id.* at 664.

The Courts have also held that a downward departure in sentencing was warranted for Defendants **younger in age** and less infirm than the Defendant in *Baron*. In *United States v. Martin,* the Court affirmed a downward departure for the Defendant who suffered from Crohn's disease. As a result of having Crohn's disease the Defendant experienced episodes of bowel obstruction and abdominal pain, which on occasion lead to hospitalization and surgery. Further, as a result of his Chron's disease, the Defendant suffered from a suppression of his immune system, which made him more susceptible to infectious diseases. The Defendant received steroid therapy to treat his Chron's disease, but still faced hospitalization on several occasions for ailments stemming from his Chron's. The prosecution offered no evidence that the BOP could adequately treat the Defendant's medical condition other than boilerplate language that the BOP "'[can] provide for Mr. Martin's medical condition.'" 363 F.3d 25, 75 (1st Cir. 2004). The Court held it was likely the Defendant's medical condition would deteriorate as a result of a lengthy period of incarceration, and therefore the district court properly departed three levels in sentencing based on physical impairment. *Id.* at 75. *See also United States v. Willis,* 322 F.Supp.2d 76 (2004) (holding at the age of 69 years old the Defendant's medical conditions were likely to get worse if incarcerated).

1. **Ms. Zastawny's Extraordinary Physical Impairment and Age Warrant a Downward Departure in Sentencing**

    a. **Ms. Zastawny's Multiple Sclerosis (MS) Diagnosis and Treatment**

Since the 1980s Ms. Zastawny struggled with orthopedic problems in her knees, forcing her to undergo several surgeries to repair the ligaments in her knees. In the early 2000s, Ms. Zastawny began experiencing symptoms of fatigue, chronic pain, muscle spasms, and cognitive and vision impairments which she attributed to stress. Additionally, she continued to experience bone and joint problems and eventually had to undergo a complete left ankle fusion surgery in 2014. In 2017, Ms. Zastawny underwent a left knee replacement, and thereafter continued to exhibit the aforementioned symptoms. After years of struggling with constant pain doctors discovered lesions on Ms. Zastawny's brain, which finally lead to her MS diagnosis.

Like many individuals with MS, Ms. Zastawny suffers from complications related to this debilitating disease. Ms. Zastawny suffers from optic neuritis in her left eye (causing pain, burning and double vision), chronic neck pain, bladder issues, ongoing and unpredictable muscle spasms, seizures, vertigo, and cognitive impairments. Ms. Zastawny even struggles with daily activities that some people may take for granted, such as walking without difficulty or extreme pain and weakness in the left side of her body.

Even with medication, Ms. Zastawny's muscle spasms and convulsions can last for over two hours at a time. During these episodes Ms. Zastawny can't do anything to control her spasms, and is forced to battle convulsions without relief. On one occasion, Ms. Zastawny suffered a seizure so severe that she broke her jaw and had to undergo surgery in January and June of 2019. Even when her convulsions and spasms do subside, she is both physically and mentally exhausted for days. As a result of the stress on her body from the surgery, Ms. Zastawny suffered a complete MS relapse. She exhibited such mental exhaustion and anguish

that it triggered excruciating back pain, and she was hospitalized for from June 21st through July 3rd. When these episodes occur, Ms. Zastawny is not even able to self-ambulate or get herself into a vehicle to be taken to the hospital.

When Ms. Zastawny suffers an MS relapse and is hospitalized she oftentimes spends days in the hospital to receive IV steroid infusions to reduce her symptoms. She currently receives outpatient treatment at the Mandell MS Center in Hartford, Connecticut, but from time to time her episodes become so bad she still requires hospitalization. Since her initial diagnosis, Ms. Zastawny has been hospitalized at least four times for complications related to her MS, most recently in February and June 2019 for spasms following ankle and jaw surgery. Ms. Zastawny receives a regiment of Ocrevus chemotherapy, as well as several other medications for her MS.[1] Even though she receives treatment, there is no cure for MS and it is a condition that worsens over time and does not improve. In addition to treatment at the Mandell MS Center Ms. Zastawny also sees an occupational therapist, speech therapist, urologist, and physiatrist for the aforementioned complications related to her MS.

In order to cope with this debilitating disease and her severe depression and anxiety, Ms. Zastawny has reached out for help and currently sees a clinical social worker at St. Francis Behavioral Health Group for Major Depression. She currently engages in individual therapy on a bi-weekly basis with her licensed clinical social worker. Please see Ms. Zastawny's medical records, filed under seal, and attached hereto as Exhibit C. Additional medical records will be supplemented and filed under seal.

---

[1] Ocrevus is the most effective medication that reduces MS relapses per year by nearly half, slows disability progression, reduces the potential for new lesions, and reduces signs of disease activity. www.ocrevus.com.

### b. Ms. Zastawny's MS Would be Made Worse if Incarcerated

Studies have shown that individuals suffering from MS have a "mean decrease in survival time of 6 to 12 years."[2] Any period of incarceration would substantially disrupt Ms. Zastawny's existing, elaborate and required medical treatment for MS. Additionally, stress is a major factor in increasing the onset of MS symptoms and the stress associated with incarceration will most certainly exacerbate her MS condition. Please see Exhibit B.

Ms. Zastawny consistently treats with her MS specialist at the Mandell MS Center in order to keep her symptoms from flaring up. Part of her treatment includes remaining on a regimen of Ocrevus chemotherapy and other medications to treat her MS symptoms. Her medical treatment is very specialized and not readily available.

### c. The Costs and Care of Ms. Zastawny's Medical Treatment would be a Burden on the Bureau of Prisons and they Cannot Adequately Treat her MS

In addition to assessing whether an individual's ill health will be affected as a result of incarceration, the Courts have also examined the possibility of financial burden on the BOP for defendants who are in ill health and require extensive medical treatment. In *United States v. Willis,* the Court notes that "[i]ncarceration of a single inmate costs the tax payer $22,519.32 per year…Community confinement of one-person costs $17,708.00 per year." 322 F.Supp.2d 76,85 (2004). The Court in *Baron* noted "[k]eeping infirm elderly people behind bars can cost up to three times more than imprisoning younger offenders." 914 F.Supp. 660, 664 (1995) citing *The Sentencing of Elderly Criminals,* 29 Am.Crim.L.Rev. 1025, 1040 (1992). When home

---

[2] Stuart D. Cook, M.D., *Expectancy in Multiple Sclerosis: Implications for Clinicians,* Vol 14 International Journal of MS Care, September 2012.

confinement is "'equally efficient as and less costly than incarceration,'" for an elderly and infirm Defendant, the courts should permit it as an alternative to incarceration. *Id.* at 664. Without medical insurance, Ms. Zastawny's medical bills for her MS treatment, and complications arising from the disease, so far for the year 2019 are in excess of $700,000 dollars. Please see Claims Statement from Anthem Insurance attached hereto as Exhibit D. The cost of incarcerating an individual, as cited above, is staggering enough on its own, but here Ms. Zastawny's MS treatment will greatly increase the cost of any period of incarceration and BOP should not be forced to bear such costs.

### D. Presumption of a Sentence Other than Imprisonment

At the time of the U.S. Sentencing Commission (USSC) was created in 1984 for the purpose of establishing sentencing guidelines for federal criminal offenses, the Congress issued a series of instructions to the USSC which were intended to inform the guidelines to be established. One such instruction is codified at 28 U.S.C. s 994(j) and reads in pertinent part:

> *The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense, and the general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury.*

Here, the purposes of sentencing can be met by a period of supervised release and only a sentence of supervised release would be consistent with the rationale of the various departure provisions in the Guidelines and the underlying statute. *United States v. Ribot,* 97 F.Supp.2d 74, 84 (D.Mass. 1999) (downward departure of seven levels justified to preserve treatment plan). There is no doubt that Ms. Zastawny is a first-time offender, and her offense is not one of violence.

The Federal Bureau of Prisons ("FBOP") outlines several medical conditions that are "permanent, progressive, and ordinarily related to diseases associated with aging that

substantially diminish the ability to function in a correctional facility." Among these conditions are certain forms of multiple sclerosis. *See* U.S. Department of Justice Federal Bureau of Prisons Operations Memorandum, "Reduction in Sentence (RIS) Criteria for Elderly Inmates with Medical Conditions," March 25, 2015.  An inmate diagnosed with a medical condition on this list, including MS, who falls into a category of being an elderly inmate may receive a reduction in their sentence when their functional or cognitive limitations interfere with their ability to perform "instrumental activities of daily living." *Id.* at p.3.  Both Ms. Zastawny's age and ill health place her in a category that warrants a downward departure in sentencing from the AGR.

### V. **CONCLUSION**

Ms. Zastawny pled guilty to the offenses in the indictment on May 21, 2019, pursuant to a plea agreement with the U.S. Attorney's Office.  Pursuant to the Sentencing Guidelines for the offenses in the indictment, Ms. Zastawny respectfully requests a term of supervised release or home confinement with allowance for Ms. Zastawny to attend her medical appointments as deemed appropriate by the Court. "Congress intended that probation would be the presumptive sentence for first time offenders not convicted of a crime of violence of otherwise serious offense." 28 U.S.C. s.944(j).

Ms. Zastawny was unfortunately consumed by ensuring her business met its financial obligations and keeping her business afloat to allow her employees to maintain employment and her lenders to be repaid which has ultimately been her downfall.  Although her conduct was unjustifiable, Ms. Zastawny has been working diligently to make amends and live her life as a law-abiding member of society.  For example, after the banks foreclosed, Ms. Zastawny used her personal funds to make sure all employees and their benefits were paid.  Despite suffering from chronic pain, muscle spasms, and seizures as a result of her MS, Ms. Zastawny continues to be a

productive member of the workforce and support her family and friends in their endeavors. Given Ms. Zastawny's efforts to remedy her past conduct, the substantial assistance she provided to the government, and her deteriorating health condition, Ms. Zastawny respectfully requests the Court impose a sentence of supervised release, or home confinement with allowance for Ms. Zastawny to attend appointments for medical care for a period of time the Court deems appropriate.

Respectfully submitted,
BETH ZASTAWNY,
By and through her attorney,

/s/ Raipher D. Pellegrino
Raipher D. Pellegrino, Esquire
BBO# 560614
Raipher, P.C.
265 State Street
Springfield, MA 01103
Tel. No.: (413) 746-4400
Fax. No.: (413) 746-5353
E-mail: rdp@raipher.com

**Certificate of Service**

I, Raipher D. Pellegrino, hereby certify that on this 28th day of October, 2019, I have served all parties of record registered with ECF for this matter with a true copy of the foregoing motion by virtue of transmitting the same to the Court via the CM/ECF system.

/s/ Raipher D. Pellegrino