UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Criminal No. 19-30019-MGM |
| v. | ) Leave to File Granted 1/7/2020 |
| BETH ZASTAWNY | ) |

## SENTENCING MEMORANDUM

The United States of America, by and through its undersigned attorneys, submits this memorandum in aid of sentencing the defendant, Beth Zastawny. The purpose of this memorandum is to respond to statements made in the defendant's sentencing memorandum. The defendant makes claims about the value of Ms. Zastawny's proffer interview and the government's decision to charge Anthony Riccitelli. It is necessary for the Court to understand the full context of that decision and the information that was actually conveyed in that proffer interview.

Proffer Interview

The proffer interview with Ms. Zastawny was conducted with the undersigned AUSA, the assigned IRS-CI case agent, and Ms. Zastawny's attorney, Raipher Pellegrino. When the AUSA and case agent conducted the proffer interview, the case agent took notes and later prepared a memorandum of the interview. The undersigned AUSA and the case agent have reviewed the defendant's sentencing memorandum, and there are some pieces of information that, to their recollection, were not said during the interview. It may well be that Ms. Zastawny disclosed these pieces of information to Mr. Pellegrino during their own conferences, but they were not stated during the proffer interview.

1

The case agent and the assigned AUSA do *not* recall, and the memorandum of the interview does *not* disclose, the following:

1. "Riccitelli asked Zastawny to "hold off" on requesting a loan from Citizens and he would take care of her loan needs once he and Marilyn were settled at Blue Hills." (Page 2, Def's sentencing memorandum).

2. "During these discussions he indicated that he and his boss 'desperately' needed to book all of DieCast's existing loans and any new loans needed, including a new equipment loan for the new paint line. He shared with Ms. Zastawny that their goal was $11Million of new loan bookings." (Page 2, Def's sentencing memorandum).

3. "During these discussions, he indicated that he did all the underwriting for Blue Hills and he only needed one signature to get the loans approved." (Pages 2-3, Def's sentencing memorandum).[1]

4. "Originally the loans from Riccitelli, family and friends were reflected on the financial statements submitted. Riccitelli instructed that they be removed otherwise the identity of who loaned the money would need to be disclosed." (Page 3, Def's sentencing memorandum). It is true, however, that Zastawny said that Riccitelli told her not to disclose the

---

[1] Had Mr. Riccitelli made such a statement, it would have been unusual since his job as the proposer of the loan, the person charged with cultivating business, was separate from the job of underwriting the loan. This separation is the norm within the banking industry because prudent risk management necessitates underwriting to be insulated from the pressures to increase business. *See, e.g.,* June 23, 1998 letter of Board of Governors of the Federal Reserve, found at https://www.federalreserve.gov/boarddocs/srletters/1998/SR9818.HTM ("Credit discipline is also enhanced by the involvement of experienced credit professionals in the approval process who are independent of line lending functions"). An experienced financial professional like Zastawny, who had closed on other commercial loans, was unlikely to be influenced by a claim that a loan officer like Riccitelli "did all the underwriting" for the bank.

Riccitelli loans. Zastawny did not say during the interview that this advice extended to the loans from family and friends.

     5.   "Also, in furtherance of his plan, Riccitelli told Zastawny to destroy any evidence of cancelled check payments to him or any member of his family to make sure they were not discovered during the field exam." (Page 4, Def's sentencing memorandum).

Finally, the defendant's sentencing memorandum makes the claim that Riccitelli made a short-term loan of $70,000 to Diecast in December 2014, with the usurious rate of $10,000 in interest. The bank records show otherwise. Riccitelli issued checks made out to Diecast in the amount of $20,000, $50,000, and $10,000 on December 5, 2014, December 22, 2014, and January 14, 2015, respectively. These totaled $80,000, and the $80,000 was repaid on January 23, 2015 from the loan proceeds. The evidence does not support the existence of a $10,000 interest payment but rather a simple repayment.

The non-existence of the $10,000 interest payment claimed by Ms. Zastawny does not, of course, make the actions of Ms. Zastawny and Mr. Riccitelli any less illegal. It does, however, point to a lingering question of motive, which is not an element of the charged crimes against Ms. Zastawny and Mr. Riccitelli. Motive, however, may have some bearing on the Court's decision in sentencing either or both defendants. Even after the government's investigation, and the submission of sentencing memoranda by both defendants, one is left to wonder why Riccitelli made loans in his personal capacity to Ms. Zastawny's company, having knowledge of the financial distress the company was in.[2]

---

[2] Ms. Zastawny claims in her sentencing memorandum that Riccitelli told Zastawny that he wanted to postpone the closing from December 2014 to January 2015 so he could obtain a bonus. This would make sense if the *opposite* were true, i.e., had Riccitelli rushed the loan

3

By contrast, Ms. Zastawny's motivations are readily apparent.  First, she was seeking to save a sputtering company that she had invested her money and time in.  Second, she repaid friends and family who had made loans to Diecast and Ms. Zastawny, with the Blue Hills Bank loans proceeds, money that was supposed to support the company.  These loans, like the debts owed to Riccitelli, were omitted by Ms. Zastawny as she applied for the commercial loan with Blue Hills Bank.  Ms. Zastawny effectively transferred the burden of Diecast's collapse from her friends and family to Blue Hills Bank.  It is understandable that Ms. Zastawny would care more about her friends and family than about Blue Hills Bank.

Conclusion

Ms. Zastawny questions why the government did not charge Mr. Riccitelli with a greater charge, and she claims that her information was essential in the charge the government did bring against Mr. Riccitelli.  The government does not question the sincerity of Ms. Zastawny during the proffer interview.  The government was interested in knowing about Mr. Riccitelli's complicity in the loan application, but the government also appreciated the fact that Ms. Zastawny did not seek to overstate Mr. Riccitelli's involvement when she could have done so.  Now, Ms. Zastawny's sentencing memorandum suggests that she provided damning information that she did not provide.

It is legitimate for the Court to consider, under 18 U.S.C. § 3553(a), the defendant's attempt to cooperate in the absence of a USSG § 5K1.1 motion.  It is simply not factual,

---

closing to December 2014, so he could obtain a 2014 year-end bonus.  There is no way Riccitelli could have guaranteed a 2015 bonus by pushing a loan to January 2015 because he had no way of knowing what the rest of 2015 would hold.  Marilyn Agulnick-House, Riccitelli's supervisor, has confirmed that bonuses at Blue Hills Bank were paid on a calendar year basis.

however, to say that Ms. Zastawny's information is the basis for the charge against Mr. Riccitelli. The essence of the charge against Mr. Riccitelli is his failure to disclose his interest in the loan that was made to Diecast, and his sharing of $80,000 in the proceeds of that loan. Those two points were established through information gathered from the bank, not Ms. Zastawny. And even if the conspiracy between Mr. Riccitelli and Ms. Zastawny were deeper, as Ms. Zastawny alleges, their private conversations would have been uncorroborated by emails to texts, making the statements of Mr. Riccitelli to Ms. Zastawny more difficult to prove.

The defendant has identified her medical condition as a reason for a non-Guidelines sentence. If the Court is inclined to grant a variance on that basis, or some other reason, it would be over the government's objection and the information indicating that the Bureau of Prisons would be able to treat Ms. Zastawny, but Ms. Zastawny's medical condition is real, and the Court may consider it. The defendant's sincere attempt to cooperate is also real, and the Court may consider it. The claim that Ms. Zastawny allowed the government to prosecute Mr. Riccitelli, on the other hand, is not true, and it should not be considered by the Court in fashioning a sentence for Ms. Zastawny.

        ANDREW E. LELLING
        United States Attorney

    By:    */s/ Alex J. Grant*
           ALEX J. GRANT
           Assistant U.S. Attorney

Dated: January 6, 2020

<u>CERTIFICATE OF SERVICE</u>

   I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants.

           By: <u>*/s/ Alex J. Grant*</u>
              ALEX J. GRANT
              Assistant U.S. Attorney